TEXAS & P. RY. CO. v. HARBY et ux.

(Circuit Court of Appeals, Fifth Circuit. May 2, 1899.)

No. 791.

1. RAILROADS—DEATH OF INFANT—INSTRUCTION—CARE IN STOPPING TRAIN.

An instruction, in an action against a railroad for causing the death of an infant, after stating that servants operating a train should use "such care as an ordinarily prudent person would exercise to stop the train in order to prevent injury to the party on the track," was qualified, without coming to a period, by adding: "And in this behalf the care and caution an ordinarily prudent person would use would be to use every power within their ability and means to stop the train, in order that injury might not be inflicted on the person on the track; and if they fail to exercise this care, and to use every power and means consistent with the safety of themselves in their position on the train, and by reason of their failure to exercise such care and caution the person is injured, then they would be liable for any damage sustained or loss occasioned by reason of the injury." Held to require a degree of care higher than such as "ordinarily prudent persons would exercise."

2. INSTRUCTIONS—CURE OF ERROR.

An instruction, in an action against a railroad for causing the death of an infant, which states that it is the duty of the engineer to use every means within his ability to stop the train in order that no injury may be inflicted to one on the track, and that a failure to exercise every power and means consistent with the safety of those on the train and engine to stop the train will render them liable in damages, and which is defective as requiring too high a degree of care, is not rendered less misleading or cured by adding that, "In this respect you are charged that a reasonably prudent and cautious person would have used all the efforts in his power and within his means and ability, consistent with the safety of those on the train and engine, to stop the train," and by conversely stating the matter, saying, "If, however, the engineer, after discovering the peril of the child, used all the efforts at his command, consistent with the safety of those on the engine and the train, to stop the train, and avoid the injury," etc., as the charge clearly limits the qualification of the duty to use all means, etc., alone by the terms "consistent with the safety of those on the engine and train."

3. SAME—QUESTION FOR JURY.

Where the evidence showed that the engineer, on a descending grade, did not discover a child on the track until within a train's length of him, when he applied the air brakes, released the sand, and did everything to stop the train, short of reversing the engine, which would result in a wreck, the reiteration of language in the instruction tending to show that in the court's view he should have reversed the engine was erroneous, as it was the duty of the jury to determine from the evidence whether the care of the engineer was such as a prudent man would have used.

In Error to the Circuit Court of the United States for the Northern District of Texas.

This was an action brought by T. H. Harby and his wife, Maggie Harby, against the Texas & Pacific Railway Company, for damages resulting from the

death of their infant child, who was run on and killed by a train of the railway company on a bridge across the Colorado river at Colorado City, Tex., on July 16, 1897. The child was 3 years and 11 months of age. The location of the bridge is west and a few hundred yards distant from the station at Colorado City. The train that ran on the child was a freight train, composed of 15 cars loaded with fat cattle, a caboose, and the engine, and was 680 feet long. It was running east, at the rate of about 18 or 20 miles an hour, when it came out of a cut and around a curve to a point from which the engineer could look through the bridge in question, distant from that point about 1,300 feet (the witnesses vary slightly as to the distance). From that point the track is straight to and through the bridge. The bridge was a covered iron bridge, 290 feet long, with trestlework at either end connected with the dump, making the length of the bridge proper and trestlework about 400 feet. The 1,300 feet of straight track immediately west of the bridge over which the train ran just before running on the child is on a down grade 66 feet to the mile towards the bridge. The course of this track is approximately due east and west. The hour when the injury was inflicted was 6 p. m. No one saw the child at the time the injury was received except the engineer and the fireman.

The engineer, called for the defendant, testified: "I was on No. 1 out of Big Springs. It was a stock train,—fifteen cars of fat cattle; and coming to the top of Colorado Hill there is a heavy grade there; and I was coming down the hill at a pretty good rate. I had but a short time to make Lorraine station, beyond Colorado, for the passenger train. Coming to the salt spur, which is perhaps a half or three-quarters of a mile from Colorado, I eased the train up, as I usually do. There is a heavy cut and a sharp curve there, and I always ease the train up so that, as soon as we get out of the cut, we can see the yard. I whistled for the station in the cut. I was getting out of the cut, and saw no train in the yard, and I released my air. The train was then reduced down to twenty miles an hour at that point. After I got out of the cut and onto the straight track about two train lengths [from the bridge the witness doubtless means], I called for signal board. We have a practice of whistling four times for the board, and if the operator has any orders for you he will give you the board. I was watching for the board, and then cast my eye down the track through the bridge. I noticed some object on the track, evidently in the shade of the column of the bridge. At that time the engine was within a train's length of the bridge. Immediately I saw the object move. I put on the emergency air, and called to my fireman, and he helped me open the sand lever. At times it works hard. We opened the sand lever, and both streams of sand were running on the rails. I passed along down, and I could see that the train was slowing up, but it was going at such speed that it was impossible to stop there. * * * After I came out of the curve, it was about a train's length before I applied the air again. I was within about a train's length of the bridge. I didn't notice any object on the bridge until I had moved at least a train length. The train was fifteen cars, engine, and caboose. * * * I did all that mortal man could do to stop that train. I gave it all the air on the train that could be given, and gave it sand. We do not use hand brakes on trains when the air is working. No, sir; I did not reverse the engine. I did not think it would affect it any. The momentum of the train coming down that hill would tear the engine all to pieces, and throw her rods, and endanger the lives of all on the engine. I was just about a train length from the bridge when I first saw the object. I could not have stopped that engine by any means in the world except by wrecking it. The curve (the one coming out of the cut) is about five hundred feet in length. * * * I put on the air the first time on the upper bridge,—the bridge near two miles from Colorado,—so as to slow it down gradually, as I always do. At the salt spur I eased the train down so I could make the spot in the yard in case there was a train there. The air was released when I went on the straight track. Just where I went on the straight track there is a little hill that I can see over, and see the yard. I could see there was no train in the yard, and I released the air. I could not see through the bridge over two train lengths. I have been going through that bridge fourteen years. It is partly of wood and partly of iron. It is a truss bridge. Overhead, the

top of the bridge obstructs your view from the board. Nothing obstructs your view from the floor of the bridge after you get onto the straight track. I looked in the yard before I got on the straight track, and I was watching for the operator to give me a signal to pass through without stopping."

The conductor of the train, called for the defendant, testified: "It is something like three or four hundred yards west of the bridge to the curve. It was on the straight track that I felt the air applied. I do not know just how far my caboose was from the curve, but I was on the straight track between the bridge and the curve. The first application of air was before we got into the cut. The caboose brake was set, and the brake on the rear car was set. I did this in order that the engineer would not have to waste his air going down hill. If it became necessary to stop, he would have air enough. This is the heaviest grade from Clyde to Toyah. I have been running over this division nine years. We had fifteen cars, an engine, and a caboose; fifteen stock cars, besides the engine and caboose, all loaded with cattle. Sixteen loads is the capacity of the engine. They hardly ever put over fourteen cars of stock. They do not want fifteen cars if they can get less. That is a full train of stock. I do not know of anything else the engineer could have done to stop the train. I do not know whether he reversed the engine or not. It is my opinion he did not. He could have done so, but it would have been extremely dangerous. An engine often strips itself, and tears up the ties; and it would be extremely dangerous to reverse an engine on a bridge. You cannot get an engineer to do it. On this occasion I do not think the train could have been stopped before it went through the bridge, caboose and all. I do not believe it could have been stopped west of the river."

The fireman testified, in substance, that just before coming to the bridge in question he was down on the deck of the engine, breaking coal; that just as the engine got to the bridge he started to get up on the seat box; that in going into town he always got up on the seat box, and rang the bell going through town; that it was for this purpose that he was going to get on the seat box just as they were starting on the bridge; that, just as he started to get up, he saw the child, and he then helped the engineer to open the sand lever; that the sand lever was opened just before the engine got onto the iron part of the bridge; that the engineer had applied the air just before they got to the bridge.

J. K. Duke, called for the plaintiff, testified in substance: "I am a draftsman, and civil engineer, and trainman. I have been in the motive railway train service. I am familiar with the operation of Westinghouse air brakes. I have had a little over four years' experience as a trainman; three years with the Rock Island, at Ft. Worth. I became familiar with the running of trains. I never run a train; that is the train master's duty,—train dispatcher's. I am familiar with the handling of air brakes or set or hand brakes. I am familiar with the appliances in use on trains to stop them or check their speed. The ordinary means for stopping trains or checking their speed are air brakes and hand brakes. There is no other method that I know of by which the engineer stops his train. Reversing an engine means to reverse the direction in which it is going, and start the wheels back the other way. That is used sometimes, but hardly ever. If you should run into an open bridge, or something of that kind, and it became necessary to stop suddenly, they generally use that means. The method used principally is to apply the brakes and drop sand on the rails. * * * The purpose of dropping sand on the rails is to keep the wheels from slipping. That sand is controlled by the engineer. He has a lever running into the engine by which he can drop sand onto the rails, and then cut it off again. The air brakes are operated by the engineer. He operates the air brakes just as he does his engine. When it is necessary, he puts on air to slow up or stop the train. When he gets slowed up enough, he releases it. I mean the engine man does this. He sets the air, and that sets all the brakes on the train that have air. He can set it at different pressure. He can set readily, and as heavy as he wants to. In an emergency he puts it on with full force, and stops as quick as he can. A train running twenty-five or thirty miles an hour ought to be stopped on an ordinary road in from three to six hundred feet. If the grade was very heavy, it might cut some figure. If it was an incline like Pike's Peak, it could cut considerable figure. If the

grade is slight, I should not think it would cut much figure. * * * A train running fifteen miles an hour, equipped with air brakes, the track sanded, and the engine reversed, with fifteen loaded cars, ought to be stopped in a train's length. * * * I am not familiar with the railroad bridge across the Colorado river. I have passed over it. I do not think it would be possible for a train running fifteen miles an hour to run twelve hundred or fifteen hundred feet with the air brakes set and the engine reversed. I do not think it would go that far. That is over a quarter of a mile. In my opinion, a train going fifteen miles an hour, with fifteen loads, equipped with air brakes, ought to be stopped in seven or eight hundred feet. Just a slight grade would not cut much figure. Of course, it would cut some figure; but, if it was a slight grade, it would not cut much. If you had only fifty per cent. of air, it would not make much difference. Some roads, if they have fifty per cent. air, they leave the entire control of the train to the air. A train is not properly equipped unless it has air brakes."

It is not necessary to further quote or summarize the testimony. After the evidence had closed, the defendant requested the court to charge the jury as follows: "The court instructs the jury that the plaintiffs have failed to show a right to recover in this case, and you are instructed to return a verdict for the defendant." This request the court refused, and to this action of the court "the defendant excepted, for the reason that the plaintiffs have not shown that the engineer in charge of the train which hurt the child failed to do everything in his power, consistent with the safety of his train and the crew on it, to stop the train after he saw the child." Whereupon the court charged the jury, among other things, as appears in the assignment of errors, which, as far as it is necessary to notice, is as follows: "First. The court erred in refusing to give the following charge, which was requested by the defendant: 'The court instructs the jury that the plaintiffs have failed to show a right to recover in this case, and you are instructed to return a verdict for the defendant.' Second. The court erred in charging the jury as follows: 'While the railroad company has the right to use this track in the prosecution of its business as a common carrier of freight and passengers, and has a right to move its trains over its track and bridges, yet, at the same time, when anybody is upon the track, either man or child, and such person is in a perilous position, and this perilous position is discovered by the servants of the railway company operating the train, these servants operating the train must use such care and caution as an ordinarily prudent person would exercise to stop the train in order to prevent injury to the party upon the track; and in this behalf the care and caution an ordinarily prudent person would use would be to use every power within their ability and means to stop the train in order that injury might not be inflicted on the person on the track; and if they fail to exercise this care, and to use every power and means consistent with the safety of themselves in their position on the train, and by reason of the failure to exercise such care and caution the person is injured, then they would be liable for any damages sustained or loss occasioned by reason of the injury. In this case you are charged that if the engineer who was operating the engine discovered plaintiffs' child upon the bridge, then it was his duty to use such care to prevent injury to the child as a reasonably prudent and cautious person would have used under similar circumstances; and in this respect you are charged that a reasonably prudent and cautious person would have used all the efforts in his power and within his means and ability, consistent with the safety of those on the train and engine, to stop the train, and avoid injury to the child; and if, knowing of the peril of the child, the engineer failed to use such means to avoid the threatened danger, then he was guilty of negligence directly causing such injury to the child, which resulted in its death, and the defendant company would be liable. If, however, the engineer, after discovering the peril of the child, used all the efforts in his power, and all the means at his command, consistent with the safety of those on the engine and train, to stop the train, and avoid the injury, then the engineer was not guilty of negligence, and your verdict should be for the defendant. You should take into consideration all the evidence introduced in all its phases, and attempt to ascertain from that evidence and surrounding circumstances whether or not the engineer, after discovering the peril of the child, could have, by the

use of the means within his power, stopped his engine before inflicting injury on the child. That is the question you are called on to determine from the evidence before you. If you find that he could have stopped the train by the exercise of such care as I have indicated to you, and that he failed to do so, and by reason of his failure and neglect to do so this child was killed, then it would be your duty to find for the plaintiffs; but, if he could not have stopped the train by the exercise of the power and means at his command, it will be your duty to find for defendant.'" To this portion of the charge, when given, the defendant duly excepted "because it is conflicting, and calculated to confuse the jury. It, in one part of it, makes the defendant liable if the perilous position of the child was discovered by the servants of defendant operating the train, and requires of them care and prudence, etc. There is no evidence that any servant but the engineer saw the child, who had any power to in any way control the train. It determines what a prudent man would do under the circumstances, instead of leaving that to the jury. In one part it charges that the engineer should do anything in his power, consistent with the safety of the crew, and does not leave him the right to act with reference to the safety of the train and freight; and, in event the servants were guilty of neglect as defined, they would be liable. In another part of the charge it is made the duty of the engineer to stop the train, if he could do so with the means at his command, without limiting this duty to the safety of the train and crew."

T. J. Freeman and R. L. Stennis, for plaintiff in error.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

McCORMICK, Circuit Judge, after stating the case as above, delivered the opinion of the court.

After hearing the evidence, the court below practically withdrew from the jury all the issues but that of discovered peril, submitting only the question, did the engineer in charge of the engine which hit the child use proper care to prevent injuring it, after he discovered its peril? and the question of damages. The jury found for the plaintiffs the sum of $750. We notice only the second of the errors assigned, because the view we have taken of it renders it necessary to reverse the judgment below, and on another trial the evidence may be materially different. In that portion of the charge given by the court to which the defendant excepted, and on which it has assigned error, the trial judge, in stating the general rule, said:

"When anybody is upon the track, either man or child, and such person is in a perilous position, and this perilous position is discovered by the servants of the railway company operating the train, these servants operating the train must use such care and caution as an ordinarily prudent person would exercise to stop the train in order to prevent injury to the party on the track."

Thus far the rule is stated with sufficient accuracy, but, without coming to a full stop, the trial judge proceeded to qualify it by adding:

"And in this behalf the care and caution an ordinarily prudent person would use would be to use every power within their ability and means to stop the train in order that injury might not be inflicted on the person on the track; and if they fail to exercise this care, and to use every power and means consistent with the safety of themselves in their position on the train, and by reason of the failure to exercise such care and caution the person is injured, then they would be liable for any damage sustained or loss occasioned by reason of the injury."

Thus qualified, the rule requires the use of a degree of care much beyond "such as ordinarily prudent persons would exercise," even the

utmost care that the most prudent persons would or could use. Such a high decree of care is not and cannot be exacted under such circumstances of corporations or of natural persons, because it could not be met in the operating of the character and amount of machinery used and necessary to be used in railroad transportation. As was said by the circuit court of appeals for the Eighth circuit, we have no question that the trial court had in mind the true rule applicable to the situation, but, unfortunately, the form in which the instruction was given would not convey the proper meaning to a jury composed of men unskilled in legal phraseology. Manufacturing Co. v. Johnson, 32 C. C. A. 309, 89 Fed. 677. The trial court probably had in mind this language, used by the supreme court of Texas in a somewhat similar case:

"If defendant, through the parties in charge of the engine, knew of Breadow's peril in time to have avoided same, such knowledge imposed upon it the new duty of using every means then within its power, consistent with the safety of the engine, to avoid running him down, and a failure so to do would render it liable, notwithstanding he may have been guilty of contributory negligence in being exposed to the peril. This new duty and liability for its breach is imposed, upon principles of humanity and public policy, to prevent what would otherwise be, as far as civil liability is concerned, the licensed destruction of persons negligently exposing themselves to peril." Railway Co. v. Breadow, 90 Tex. 26, 36 S. W. 410.

It is to be considered that the language just quoted is not addressed as an instruction to a jury, but to trial judges and the legal profession. It is to be observed, also, that the using of "every means then within the power of the servants of the defendant" is subject to the qualification embraced in the further language, "consistent with the safety of the engine." In that case it was the running of an engine alone which inflicted the injury, and the words "consistent with the safety of the engine," in their application to this case, are equivalent to the words "consistent with the safety of the train," if these are understood to embrace the engine, the cars, the amount and character of freight, and the persons on the train. The analogous qualification actually given in this case in the statement of the general proposition is, "consistent with the safety of themselves in their position on the train."

The defect which we are attempting to point out was not cured or rendered less misleading and hurtful when the judge came to apply his general proposition to the case the jury were considering. Immediately, in the same brief paragraph, without the interposition of a full stop, the language is repeated:

"And in this respect you are charged that a reasonably prudent and cautious person would have used all the efforts in his power and within his means and ability, consistent with the safety of those on the train and engine, to stop the train."

Then, in the next sentence, stating the matter conversely, the judge says:

"If, however, the engineer, after discovering the peril of the child, used all the efforts in his power, and all the means at his command, consistent with the safety of those on the engine and train, to stop the train, and avoid the injury," etc.,

—Still clearly limiting the qualification of the duty to use all the means, etc., alone by the terms, "consistent with the safety of those on the engine and train." Then, further on, in concluding the charge on this subject, the judge said:

"If you find that he could have stopped the train by the exercise of such care as I have indicated to you, and that he failed to do so, and by reason of his failure and neglect to do so this child was killed, then it would be your duty to find for the plaintiffs; but, if he could not have stopped the train by the exercise of the power and means at his command, it will be your duty to find for defendant."

In the opinion of the supreme court of Texas from which we have quoted it is said:

"The principle [of humanity], however, has no application in the absence of actual knowledge on the part of the person inflicting the injury of the peril of the party injured in time to avoid the injury by the use of the means and agencies then at hand. If he had no such knowledge, the new duty was not imposed, though it be clear that by the exercise of reasonable care he might have acquired the same. The burden of proof was upon the plaintiff in this case, in order to recover for a breach of such new duty, to establish, not that the employés might, by the exercise of reasonable care, have acquired such knowledge, but that they actually possessed it."

In this case there is an utter absence of proof that the engineer saw the child until the engine was within a train's length of the bridge, or that the fireman saw it until just as the engine got to the bridge, or that any other servant of the company saw it before it received the fatal injury. There is no evidence tending to show that the brakes and sand were not applied to the utmost as soon as the child's presence on the track was discovered. On the contrary, the proof is all one way, and conclusive, that both of these means were used as promptly and efficiently as was possible. The engine was not reversed. There was no dispute or room for question about what was done and what was not done. The very substance of the issue was, not what was done or what was not done, but whether what was done was the use of such care and caution as an ordinarily prudent person would exercise to stop the train in order to prevent the injury to the party on the track. That is not a question of law, otherwise the trial judge would not have submitted it to the jury. Further than this, there is no proof tending to show that the engineer could have done anything more than he did do, except to reverse his engine. It is doubtless true that a competent engineer in charge of such an engine, pulling such a train, at such a place, and exercising the care and caution of an ordinarily prudent person, would have used every power within his ability and means to stop the train, consistent, in his judgment, with the safety of those on the engine and on the train, and of the train and its freight. From necessity, it was, and must ever be, a question for enlightened judgment in the very emergent time, "What means of those within my reach can I use that are consistent with my own safety," the safety of other persons on the engine and train, and the safety of the train itself and its freight? It is true that the judgment of the jury is the final arbiter, and in particular cases it may be true that the defendant is liable for an error in judgment of its servant engineer. The engineer says that, having

in view the grade of the track, the weight of the train, its speed, its proximity to the bridge and to the child on the track, his judgment was that to reverse the engine would not affect the speed of the train or the safety of the child, but that it would tear the engine all to pieces, throw her rods, and endanger the lives of all on the train, and that he could not stop the engine by any means in the world except by wrecking it. It cannot be the law that the defendant or its servants are in duty bound to use means that will cause them to incur such extreme hazards on the barest possibility of being thereby able to prevent running onto a person, even a tender infant, whose presence on the track was not to have been expected, and was not discovered until the case presented the dire alternative of a fatal injury to the child or the most serious injury to the train and those thereon. We are not able to believe that the jury would or could have found as a fact that a competent engineer, using the care and caution of an ordinarily prudent person, would have reversed his engine under the circumstances and conditions shown by the proof; or that, if he had done so, the injury to the child would have been thereby prevented, if they had not been misled by the charge of the court, or by their misunderstanding of his charge, into accepting it as matter of law, binding on their consciences as sworn jurors, to find for the plaintiffs because the engineer did not reverse his engine. The tone of the instructions, and the reiteration of the definition of that care which a person of ordinary prudence would use, seems to us—as we think it must have appeared to the jury—to express that the judge's view of the law was that the engineer should have reversed his engine. We are far from deeming it our duty to limit the sound discretion of the trial judge in using large freedom in discussing the testimony in his charge to the jury. It is both his privilege and his duty to do so. But he should at the same time take care to inform them that his suggestions are not binding on them as matter of law; that, however high may be their regard for his views of the evidence in a case like this, it is their duty, and not his, to determine from all the facts admitted or established by proof whether the care and caution shown to have been used was up to that measure which, in their judgment, a person of competent skill and of ordinary caution and prudence, placed in the engineer's position, would have exercised. For the error in the charge of the court below, the judgment must be reversed, and the case is remanded to the circuit court, with instructions to grant a new trial.